# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JULIO ENRIQUE NEGRON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:14-cv-00852 |
| v. | ) | Judge Trauger |
| | ) | |
| NANCY BERRYHILL,[1] | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is the plaintiff's Motion for Judgment on the Administrative Record (Docket Entry No. 12), to which the defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 13). The plaintiff has filed his reply to the defendant's response. (Docket Entry No. 14.) Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 10),[2] and for the reasons given herein, the court finds that the plaintiff's motion for judgment be DENIED and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

The plaintiff, Julio Enrique Negron, filed an application for Disability Insurance Benefits ("DIB") under Title II and an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on March 10, 2010, alleging disability onset as of June 30, 2009, due to

---

[1]Nancy Berryhill became acting Commissioner for the Social Security Administration on January 23, 2017, and is therefore substituted as Defendant. *See* Fed. R. Civ. P. 25(d).

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

"stroke, brain damage, forgetfulness, delusional, tumors on finger, and cysts on bottom of feet." (Tr. 73-74, 83-84.) The plaintiff's claims were denied at the initial level on September 9, 2010, and on reconsideration on May 5, 2011. (Tr. 73-76, 79-84, 91-96.) The plaintiff subsequently requested *de novo* review of his case by an administrative law judge ("ALJ"). (Tr. 97-101.) The ALJ heard the case on September 20, 2012, when the plaintiff appeared with counsel and gave testimony. (Tr. 11, 31-72.) Testimony was also received by an impartial vocational expert. (Tr. 61-69.) At the conclusion of the hearing, the matter was taken under advisement until October 2, 2012, when the ALJ issued a written decision finding the plaintiff not disabled. (Tr. 8-25.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.

2. The claimant has not engaged in substantial gainful activity since June 30, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).[3]

3. The claimant has the following severe impairments: leukopenia, hypertension, major depressive disorder, post-traumatic stress disorder, history of substance abuse in remission (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[3]For insured status, an individual must have 20 quarters of coverage in a 40-quarter period ending with the first quarter of disability. *See* 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. § 404.130. The plaintiff's insured status expired on June 30, 2009. (Tr. 13, 161.) For Title II benefits, a claimant must prove that he was disabled prior to the expiration of his insured status. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). When a claimant loses insured status, the claimant is no longer eligible for benefits for a disability arising thereafter. *Henley v. Comm'r of Soc. Sec.*, 58 F.3d 210, 213 (6th Cir. 1995) ("When one loses insured status, one is simply no longer eligible for benefits for disability arising thereafter.").

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift 20 pounds occasionally and ten pounds frequently. He can sit, stand, or walk for six hours total each. He can never climb ladders, ropes, or scaffolds. He can occasionally perform all other postural activities. He can perform no work around hazards in the workplace or unprotected heights. He is limited to unskilled work consisting of simple tasks and instructions. He can have occasional contact with the general public. He can have work-only related contact with co-workers and supervisors. He can perform no production pace or quota type work. He can handle occasional change in the workplace.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on May 28, 1965 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and   416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-25.)

On January 22, 2014, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).

## II. REVIEW OF THE RECORD

The following summary of the medical record is taken from the ALJ's decision:

After careful consideration of all of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant was admitted to Gateway Medical Center on December 27, 2009 due to dizziness and blurred vision he began experiencing the day before. He reported he almost passed out. His blood pressure was 179/106, he had a history of hypertension, and he had not been taking medication (lF at 8). His vision was "ok" at the time of his assessment, and no deficits were noted with his upper or lower extremities bilaterally. He denied numbness and tingling. He was able to ambulate independently, and admitted he could perform all activities of daily living without assistance. He reported he had not taken blood pressure medications for a few years (lF at 9). The severity of his symptoms was listed as mild (1F at 11). A CT of his head was normal except for a "well-defined hypodensity in the right basal ganglia" which "may represent a remote lacunar infarct or prominent perivascular space (lF at 17). His EKG was normal (lF at 19). He was discharged the same day in improved condition. His blood pressure at discharge was 148/86 (lF at 10). He was given prescriptions for Hydrochlorothiazide (HCTZ) and Meclizine (lF at 7). He was seen two days later at the Tennessee Department of Health complaining of high blood pressure and dizziness. His blood pressure was 150/100 (2F at 13). He was given a prescription of Lisinopril and Diphenhydramine (2F at 14).

On January 11, 2010, the claimant had a follow-up appointment at the Tennessee Department of Health. It was noted that he had a history of hepatitis C seven years ago and a history of anxiety for which he used to take Xanax (2F at 11). On January 13, 2010, the claimant reported to Gateway Medical Center that he blacked out the night before and was confused (lF at 22). His wife reported he experienced memory loss and slurred speech (2F at 9). He felt dizzy that morning. His blood pressure was 140/92 (lF at 22). He was told to stop Lisinopril by the Tennessee Department of

Health on January 14, 2010 (2F at 8). His blood pressure was 120/80 (2F at 7). He was cleared to restart Lisinopril on January 22, 2010 (2F at 9).

The claimant had his initial assessment at Affiliated Neurologists with Dr. James Anderson on February 3, 2010. He reported that his primary problem was difficulty with his balance. He described some "true" vertiginous symptoms. He reported that he had significant loss of balance on Christmas Day of 2009. He reported this occurred occasionally and was of mild severity. He reported falls on three occasions, and reported some episodes of loss of consciousness. He noted that he had continuous dizziness that was magnified with valsalve maneuvers or rapid changes in body positioning. He described some visual changes with loss of peripheral vision and some blurred vision, which fluctuated over time. His anxiety and disorientation, for which he had been to the emergency room, were found to be related to hypertensive, for which he was taking Lisinopril and Hydrochlorothiazide (8F at 23). He described memory loss over the past year that had been gradually progressive. He reported low back pain that began many years ago and that occurred on a weekly basis, and for which pain medicines helped his pain. There was no clear radiation into the lower extremity. He reported drinking one to two drinks a week and not using recreational drugs (8F at 24). He reported difficulties with sleeping and scored a ten on the Epworth Sleepiness Scale, which indicated a moderate chance of dozing (8F at 24 and 31).

The claimant's physical examination showed he was alert and oriented with a normal focus of attention and concentration. He had a normal fund of knowledge. His affect was appropriate and his mood was level. There was no evidence of gross cognitive deficits or thought disorder. His cranial nerves II-XII were grossly intact. His blood pressure was 130/80. His heart examination was normal. His gait testing was normal. His Romberg test was negative. His motor examination revealed adequate fine motor facility and 5/5 strength throughout. There was no evidence of tremor, atrophy, fasciculations or tone changes. His sensory examination revealed intact sensation for all modalities throughout, except for diminution of pinprick sensation over the dorsal aspect of the right thumb. His deep tendon reflexes were 1-2+ and bilaterally symmetric in both the upper and lower extremities with plantar responses downgoing bilaterally. His straight leg-raising tests were negative bilaterally (although the physical examination form indicates otherwise on 8F at 27) (8F at 25). He had mild to moderate tenderness in his cervical spine, lumbar spine, and both SI joints. He had tenderness over the occipital area (8F at 27).

Dr. Anderson's impression was that the claimant was having central vertiginous episodes. He had what sounded like anxiety attacks and could have been experiencing true panic attacks, and due to the number experienced, could qualify as having a panic disorder. He had some mild occipital neuralgia, as well as bilateral lumbosacral radiculopathy and sacroilitis. His encephalopathic episodes, which

5

included problems with memory loss, could be related to anxiety. He started the claimant on Alprazolam, as well as a low dose of Gabaminergic at bedtime. He noted that the claimant's CT, which showed a basal ganglia lacune, was now symptomatic, and he may need to start on a daily Aspirin (8F at 26).

On March 5, 2010, the claimant had a follow-up appointment with the Tennessee Department of Health. He was given Xanax for anxiety. His blood pressure was 130/80 (2F at 3). He was told to stay off HCTZ and Lisinopril and was put on Verapamil. He was encouraged to follow-up with a neurologist (2F at 4). On March 12, 2010, his blood pressure was 140/90 (2F at 1). On March 16, 2010, it was noted that his white blood counts were doing much better (11F at 4). He was seen at Gateway Medical Center on March 23, 2010 for chest and arm pain. His symptoms were described as mild (3F at 9). His laboratory results were normal (3F at 10). His chest x-ray was normal (3F at 11). He was given Motrin (3F at 8). On March 24, 2010, he had a follow-up appointment at Affiliated Neurologists. He reported he continued to have dizzy episodes associated with anxiety, decreased memory and concentration, and "weakness all over" lasting five to 30 minutes. He reported he felt his medications were helping. He stated he was unable to afford testing. He was given prescriptions for Xanax, Zoloft, and Neurontin. It appears he was diagnosed with encephalitis (8F at 15). He went back to Gateway Medical Center on March 28, 2010 with a fever, and complained he was vomiting blood (3F at 4-5). He was given 650mg Tylenol, and was to see an oncologist next month due to loss of bone marrow (3F at 1).

The claimant had a bone marrow biopsy on April 22, 2010 at Tennessee Oncology (9F at 5). The results showed hypocellular bone marrow, with no evidenced monoclonal population and no evidence of a myelophthisic process. There was no evidence of leukemia or lymphoma. The impression was either drug effect or immune effect secondary to previous IV drug use, which the doctor suspected was the answer. Most of his symptomatology was related to other issues, mostly neurologic. The doctor did not think it was related to his blood count. His physical examination showed significant eczema on his hands with some swelling in his hands. His neurological examination was normal. His blood pressure was 126/81 (9F at 3). The recommendation was for no active intervention (9F at 4). He was diagnosed with leukopenia. On May 17, 2010, the claimant's hemoglobin was high, at 17.3, but his other complete blood counts were normal, including his white blood count at 4.0 (11F at 5). His blood pressure was 130/90 (11F at 1). He continued to be assessed with chronic anxiety (11F at 2).

The claimant received a consultative psychological examination on June 10, 2010 by Kimberly Tartt-Godbolt, Psy.D. (4F). Dr. Tartt-Godbolt noted that he displayed a normal gait, and also displayed hand tremors. His rate of speech and clarity of speaking was normal (4F at 1). He reported being physically and mentally abused

by his father, and bullied in school.  He attended a facility for substance abuse rehabilitation in 2000 and 2007 for six months for alcohol and cannabis use.  He stated that he currently drank socially, but had not used cannabis for three years (4F at 2).  Dr. Tartt-Godbolt assessed him with a global assessment of functioning score of between 46 to 51, which could mean serious or moderate symptoms.  However, her opinion indicated moderate symptoms.  She reported the claimant appeared to fall into the low average range of intellectual functioning.  She opined that he showed evidence of mild to moderate impairment in his short-term memory; evidence of moderate impairment in his ability to sustain concentration; no evidence of long-term and remote memory functioning; and moderate impairment in his social relating.  He appeared moderately impaired in his ability to adapt to change.  He appeared able to follow instructions, both written and spoken.  She diagnosed him with post-traumatic stress disorder, major depressive disorder, and cannibus dependence in remission (4F at 4).

The claimant attended a physical consultative medical examination by Dr. Jerry Surber on June 16, 2010 (5F).  The claimant apparently reported he had a stroke in December 2009 (note above that his medical records made no indication of CVA).  He complained of memory problems, balance problems with dizziness, and intermittent tightness in his neck, shoulders, and lower back (5F at 1). His blood pressure was 140/104. His visual acuity without glasses was 20/50 in the right, and 20/30 in the left. No mention was made about problems with peripheral vision. His neck showed no mobility limitations (5F at 2).  He had full range of motion in his dorsolumbar spine, shoulders, elbows, hips, knees, and ankles.  He showed no edema.  His peripheral pulses were strong and he was able to do a voluntary full squat and stand maneuver. His straight leg-raising tests were negative, both in the sitting and supine positions.  It was noted that he appeared shaky whether standing on his right or his left leg.  His neurological examination was normal.  He was able to perform the straightaway, tandem, and heel-toe walks. He had a slight limping gait toward the left, and used no type of assistive device (5F at 3).  He attributed his shakiness and limp to pain on weightbearing in his left foot.  Apparently this pain was due to two small cysts on the plantar surface of his left foot (5F at 4).

On August 9, 2010, the claimant was seen at Affiliated Neurologists complaining that his hands were shaking "all the time," he had trouble sleeping even with medication, and he thought he had "some type of mild heart attack" (8F at 8).  It was noted that his bone marrow biopsy was positive, but it could not be treated due to his lower white blood cell count.  It was noted that his vertigo was improved.  His blood pressure was 138/86.  He was prescribed over-the-counter wrist splints, prescribed Zoloft, and his dosages of Neurontin and Xanax were increased (8F at 6).  It was noted at his follow-up visit to Tennessee Oncology on August 2S, 2010, that he had been doing monthly blood counts, which had not varied, and he admitted he had been

doing well with no complaints. His blood pressure was 140/94. His white blood cell count was 2.8 with an ANC of 1,600 (9F at 1).

On November 8, 2010, the claimant went to the emergency room for what he thought was a stroke. His blood pressure was 192/120 at admittance and 160/114 on recheck (18F at 27). He reported that he experienced "lock jaw," felt dizzy, and thought he was going to pass out (18F at 28). His EKG was normal (18F at 37). His head CT was normal (18F at 36). His physical examination was normal, and the doctor noted that his complete blood cell count and chemistries results were normal (18F at 31). His blood pressure was 145/99 at discharge (18F at 29). At his follow-up visit at Affiliated Neurologists on November 10, 2010, it was noted that he had been out of Xanax for one week. It was noted that his vertigo was stable (8F at 2). The claimant apparently told the Affiliated Neurologists that he had had a stroke, but there was no indication from the emergency room treatment notes that what he suffered was a stroke (8F at 4).

On December 3, 2010, it was reported by Tennessee Oncology that his white blood cell count remained "about the same." He had no issues with his leukopenia. His blood pressure was 139/95. It was noted that he had been seen in the emergency room for what sounded like a transient ischemic attack, but by the time he was actually seen, his symptoms had resolved (16F at 1).

On March 3, 2011, the claimant was seen at Affiliated Neurologists. His blood pressure was 122/88. His vertigo was stable and well controlled. His anxiety was "fairly well controlled" (20F at 30). On April 4, 2011, the claimant was seen for medication refill at the Te1messee Department of Health. He reported taking his medications daily. No problems were noted. His blood pressure was 120/80 and his physical examination was normal (17F at 14). On June 9, 2011,the claimant was seen at Affiliated Neurologists. It was reported that his dizziness was slowly improving, and his vertigo, tremors, and panic disorder were stable. He also reported lower back pain, shoulder, arm, and leg pain due to a moving vehicle accident (20F at 24). On September 12, 2011, he reported tremors in both hands. He also reported increased stress because he was moving to a new home. He reported that his lower back pain and neck pain had increased after he moved furniture into his new home (20F at 20). On October 13, 2011, his insomnia was reported as periodic and his tremor and lower back pain stable (20F at 14). He reported right subscapular pain, but no neck pain (20F at 17). He was prescribed Mobic and Ambien (20F at 14).

On November 7, 2011, the claimant was seen in the emergency after falling while getting out of his bathtub three days previously. However, he denied that it was related to dizziness, and he denied a loss of consciousness. He reported simply that he slipped and fell on his tile floor. His blood pressure was 161/106 on admittance (18F at 8-9). He reported that he had been out of his Verapamil for a week. His

blood pressure was 146/92 at discharge (18F at 10). The doctor reported that his white blood cells in his urinalysis were 11-20, but all other laboratory results were within normal limits (18F at 12). The claimant followed up at the Tennessee Department of Health on November 8, 2011for a prescription for Verapamil. His blood pressure was 120/80 (17F at 10). It was noted that his EKG was abnormal and he was scheduled for a cardiology consultation (17F at 11). On January 9, 2012, it was reported that his tremor had improved, his lower back pain was stable, and he reported neck pain that "comes and goes" (20F at 10 and 13). He was satisfied with the level of control with his medications (20F at 10).

On April 12, 2012, the claimant was picked up by ambulance after his son called 911 and apparently reported a stroke. The claimant complained of numbness in his mouth and teeth, dizziness, and leg spasms (19F at 43). It was reported that he was delirious (19F at 3). He apparently told the nurse he had bone marrow cancer (19F at 12). His chest and head x-rays were nonnal (19F at 21-22). His EKG was normal except for incomplete RBBB (19F at 4). His extremities exhibited full range of motion. His neurological examination was normal, with no motor or sensory deficits and normal reflexes (19F at 4). He was diagnosed with dizziness, paresthesia, and hypertension (19F at 9). He reported that he had been off his medications for a week (19F at 8). On May 10, 2012, the claimant was seen at Affiliated Neurologists. He told them that his April 2012 emergency room visit was due to a stroke (20F at 5).

Statements the claimant made were sometimes confusing and contradictory, even when compared with prior statements on the record. He consistently reported to doctorsthat he had had a stroke, though there was no indication the claimant ever suffered a stroke. At one point, he apparently told a doctor he had a history of hepatitis C, yet there was no indication of this in the record, or of any doctor following up on this. He told a nurse he had bone marrow cancer, rather than his actually diagnosed problem of leukopenia. He testified that he lost his license due to a DUI last month. However, he reported he quit driving six months before his DUI. He testified that he experienced vertigo 90% of the time, yet before his DUI, he was still driving. He testified that he could sit for only 30 minutes due to balance issues, yet he was able to ride in a car for more than an hour to the hearing with no problems. He stated he had panic attacks "all of the time," yet was able to attend two to three hour church services. He reported he suffered from memory loss, yet he was able to remember he cooked for President Bush at an inauguration, and could recall his work history in detail at the hearing. He testified that his son had to shave him because he could not shave himself

In his Function Report, he indicated that he had no problems with his personal care except that it "just takes me longer" and that sometimes his family had to sit with him while he bathed to make sure he did not fall. Although he claimed to constantly run into walls, trip over things, and fall, he did not use any assistive devices to aid

him with ambulation (4E at 7). He testified that he fell in the bathroom due to his dizziness and difficulty with balance, yet his medical records showed that dizziness or balance problems had nothing to do with it. Although he testified that he constantly shook, even to the point that his handwriting looked like a first grader's, his testimony indicated the only reason he no longer played pool was because he no longer had a pool table. His Function Report indicated that he did play pool when he had his pool table, with his only complaint being that he got tired after one game of pool (4E at 5). He testified that he would burn a potato in a microwave, yet according to his Function Report, he could prepare his own meals and microwave a sandwich (4E at 3). He told the consultative psychological examiner that he could prepare elaborate meals, yet he could not wash dishes, vacuum, sweep, or do laundry because of his physical health problems. It is not clear why he could do the one and not the other.

Regarding the claimant's alleged physical impairments, his physical examinations were largely normal, as well as were his imaging and EKG's. The time period he exhibited his most serious symptoms was from December 2009 to perhaps May 2010. At his consultative psychological examination in June 2010, he showed shaky hands, but a normal gait. At his physical consultative examination, no mention was made of shaky hands, but he had a slight limp. Other than that, his physical examination was largely normal. It appears that his [exacerbation] of symptoms occurred when he was non-compliant with his medication. There is little indication of the claimant being on a prescribed pain medication. He was in a moving vehicle accident in June 2011, but the first indication he was on a prescribed pain medication was in October 2011. Regardless, in January 2012, he was satisfied with the level of control with his medications and in April 2012, he had full range of motion of his extremities. Of particular interest, is that his primary care provider, in his medical source statement, listed only lumbago as the reason the claimant was limited. He never mentioned the claimant's dizziness or loss of balance.

Regarding the claimant's alleged mental impairments, he never received treatment from a mental health provider. His only treatment was with psychiatric medications prescribed by his primary care provider. It also appears from the record that the times he ended up in the emergency room due to panic-type symptoms, he had not been taking his medication.

Great weight is given to the opinion of the State agency medical consultant because it is consistent with the medical record (10F). The agency consultant is an acceptable medical source. His opinion is reflected in the above residual functional capacity. However, the undersigned finds the claimant more limited in his ability to climb than was assessed by the agency consultant (10F at 3). The agency consultant's opinion is generally supported by the opinion of Dr. Surber (5F at 4). However, the undersigned finds the claimant less limited in his ability to stand or walk than

assessed by Dr. Surber. It appears Dr. Surber made this assessment due to the cysts he found on the claimant's feet. However, this is the only occasion in the record of cysts on the claimant's feet. None of his long-term primary care providers mentions cysts.

Great weight is given to the opinion of the claimant's primary care provider, Dr. Anderson, regarding the claimant's ability to lift and carry  However, no weight is given to his assessment of the claimant's ability to sit, stand, and walk (21F at 1). These limitations would not even equal an eight-hour workday, and he also opined that the claimant would not need to lie down during an eight-hour working shift.  No weight is given to his assessment that the claimant could never stoop or crouch, and was limited in reaching, pushing, and pulling.  His treatment notes, summarized above, do not support any of these extreme limitations considering that the claimant appeared to do well with his medications, and showed full range of motion in his extremities in April 2012.  Further, while he may have been "sore" afterward, he felt well enough to move furniture into a new home in September 2011.

Two state agency psychological consultants provided opinions assessing the claimant's functional limitations (6F, 7F, 12F, and 13F). Giving the claimant the benefit of the doubt, the undersigned has given great weight to the most limiting assessments of each consultant in order to form the above residual functional capacity.  Using the more limiting assessments is supported by the opinion of Dr. Tartt-Godbolt, whose opinion is discussed above (4F at 4). Dr. Tartt-Godbolt is an acceptable medical source, and based her opinion on an examination of the claimant. Her opinion of no more than moderate limitations is supported by the claimant's non-compliance issues, and his lack of mental health treatment.

(Tr. 17-23.)

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

The determination of disability under the Act is an administrative decision. The only questions before this Court are: (i) whether the decision of the Commissioner is supported by substantial evidence; and (ii) whether the Commissioner made any legal errors in the process of reaching the decision. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of

Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

Substantial evidence has been defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller v. Comm'r of Soc. Sec.,* 811 F.3d 825, 833 (6th Cir. 2016) (citation and internal quotation marks omitted).

The Court must examine the entire record to determine if the Commissioner's findings are supported by substantial evidence. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and final determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

## B. Determining Disability at the Administrative Level

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The asserted impairment(s) must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(D); 20 CFR §§ 404.1512(a), (c), 404.1513(d). "Substantial gainful activity" not only includes previous work performed by the claimant, but also, considering the claimant's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which the claimant lives, or whether a specific job vacancy exists, or whether the claimant would be hired if he applied. 42 U.S.C. § 423(d)(2)(A).

In the proceedings before the Social Security Administration, the Commissioner must employ a five-step, sequential evaluation process in considering the issue of the claimant's alleged disability. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must show that he is not engaged in "substantial gainful activity" at the time disability benefits are sought. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007); 20 CFR §§ 404.1520(b), 416.920(b). Second, the claimant must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 F. App'x 83, 85 (6th Cir. 2004). Third, if the claimant has satisfied the first two steps, the claimant is presumed disabled without further inquiry, regardless of age, education or work experience, if the impairment

at issue either appears on the regulatory list of impairments that are of sufficient severity as to prevent any gainful employment or equals a listed impairment. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 CFR §§ 404.1520(d), 416.920(d). A claimant is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability that ends the inquiry. *See Combs, supra; Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

If the claimant's impairment does not render him presumptively disabled, the fourth step evaluates the claimant's residual functional capacity in relationship to his past relevant work. *Combs, supra*. "Residual functional capacity" ("RFC") is defined as "the most [the claimant] can still do despite [his] limitations." 20 CFR § 404.1545(a)(1). In determining a claimant's RFC, for purposes of the analysis required at steps four and five, the ALJ is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir.1988). At the fourth step, the claimant has the burden of proving an inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474. If the claimant cannot satisfy the burden at the fourth step, disability benefits must be denied because the claimant is not disabled. *Combs, supra*.

If a claimant is not presumed disabled but shows that past relevant work cannot be performed, the burden of production shifts at step five to the Commissioner to show that the claimant, in light of the claimant's RFC, age, education, and work experience, can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). In order to rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a claimant can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). Even if the claimant's impairments prevent the claimant from doing past relevant work, if other work exists in significant numbers in the national economy that the claimant can perform, the claimant is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the five-step sequential evaluation process, the claim is not reviewed further. 20 CFR § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a claim at step two of the evaluative process is appropriate in some circumstances).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred (1) by failing to consider properly all of the plaintiff's impairments and by failing to provide sufficient reasons for not finding these impairments to be severe impairments; (2) by failing to include a function-by-function assessment in the RFC assessment as required by SSR 96-8p; (3) by failing to consider properly the medical source statement ("MSS") completed by Dr. Anderson; (4) by giving great weight to the opinion of Dr.

Tartt-Godbolt; and (5) by failing to perform a proper credibility analysis. (Docket Entry No. 12-1, at 1-2.) The plaintiff requests that this case be reversed and benefits awarded, or, alternatively, that this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration by a different ALJ. *Id*. at 13.

Sentence four of 42 U.S.C. § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3). "In cases where there is an adequate record, the [Commissioner's] decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Additionally, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a claimant's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994). Plaintiff's statement of errors is addressed below.

**1. The ALJ erred by failing to consider properly all of the plaintiff's impairments and by failing to provide sufficient reasons for not finding these impairments to be severe impairments.**

The plaintiff argues that he was diagnosed with vertigo; occipital neuralgia; memory loss; encephalopathy/encephalopathic episodes; insomnia; CVA; bilateral lumbar radiculopathy; and tremor, but that the ALJ failed to give sufficient reasons for not finding these impairments to be severe. (Docket Entry No. 12-1, at 5.) The plaintiff asserts that these impairments "cause more than a slight abnormality on the plaintiff's ability to function" and that the ALJ should have considered

16

these impairments because "they cause additional limitations which would reduce the residual functional capacity (RFC) assigned by the ALJ." *Id.* at 6.

At step two of the sequential evaluation process, a plaintiff bears the burden of showing that a medically determinable impairment is severe and meets the twelve month durational requirement of the Act. *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). A "severe impairment" is "any impairment or combination of impairments which significantly limits [the plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).[4] The Sixth Circuit has described the severity determination as "a *de minimis* hurdle in the disability determination process," in which "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs*, 880 F.2d at 862. The goal of this test is to screen out groundless claims. *Id*. at 863.

The court notes that, although the plaintiff alleges that these impairments cause additional limitations that would reduce his RFC, the plaintiff fails to identify the limitations that the ALJ should have included in the RFC or to cite any evidence in the record that demonstrates that such additional impairments had or will have any impact on his ability to perform basic work activities. Further, the ALJ considered these impairments over the course of the ALJ's decision. The ALJ noted: (1) that the plaintiff's vertigo "was stable" and that he had been driving despite claiming "that he experienced vertigo 90% of the time," (Tr. 20-21, 22, 41-42, 56, 314, 318, 516, 522); (2) that Dr.

---

[4]Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 CFR § 404.1521(b).

Anderson described the plaintiff's occipital neuralgia as "mild," (Tr. 18, 337); (3) that Dr. Anderson reported that the plaintiff's encephalopathic episodes, which included memory loss, could be related to anxiety, that Dr. Tartt-Godbolt opined that the plaintiff showed mild to moderate impairment to his short term memory but he showed no impairment to his long term and remote memory functioning, and that at the hearing the plaintiff could recall his work history in detail (Tr. 18, 19, 22, 38, 61-64, 290, 337); (4) that in February 2010 the plaintiff reported difficulties with sleeping and scored a ten on the Epworth Sleepiness Scale, which indicated a moderate chance of dozing, and that in October 2011 the plaintiff's insomnia was reported as periodic (Tr. 18, 21, 336, 343, 506); (5) that the plaintiff reported having a cardiovascular accident ("CVA") in December 2009, that in February 2010 Dr. Anderson reported that the plaintiff's CT showed a basal ganglia lacune that was symptomatic and that the plaintiff might need a daily aspirin, and that the plaintiff claimed that he suffered from strokes in November 2010 and April 2012, but the ALJ remarked that the medical records did not indicate that the plaintiff had suffered a stroke (Tr. 19, 20, 21, 294, 314, 337); (6) that the plaintiff's bilateral lumbar radiculopathy was without significant complaint (Tr. 18, 337); and (7) that in February 2010 Dr. Anderson reported that the plaintiff's test showed no evidence of tremor and that in June 2011 and October 2011 the plaintiff's tremors were noted as stable (Tr. 18, 21, 337, 506, 516).

Moreover, the regulations do not require that all diagnosed impairments be scrutinized for their severity, much less that any such scrutiny be made explicit in the ALJ's decision. Even an erroneous finding that an impairment is non-severe is not reversible error, so long as at least one severe impairment is identified and the sequential evaluation continues. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). A claimant's residual functional

capacity is determined in view of the combined effects of all medically determinable impairments, severe and non-severe. *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (holding that an ALJ's failure to find an impairment severe at step two is not reversible error "when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination."); 20 C.F.R. § 404.1523. Also, the fact that some of a claimant's diagnosed impairments may have gone unmentioned at the step two severity determination is "legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz*, 837 F.2d at 244) (failure to find that an impairment was severe at step two was harmless error where other impairments were deemed severe). Further, a diagnosis alone does not establish a condition's severity or its effect on a claimant's functional limitations. *Lyons v. Astrue*, No. 3:10-CV-502, 2012 WL 529587, at *4 (E.D. Tenn. Feb. 17, 2012). A "plaintiff must offer evidence or arguments showing that a restriction resulting from an impairment requires greater limitations than those found in the ALJ's RFC determination." *Toombs v. Colvin*, No. CIV.A. 3:14-1145, 2015 WL 4389781, at *11 (M.D. Tenn. July 15, 2015), *report and recommendation adopted sub nom. Toombs v. Soc. Sec. Admin.*, No. 3:14-CV-1145, 2015 WL 4647634 (M.D. Tenn. Aug. 5, 2015) (citing *Lyons*, *supra*).

Here, the ALJ found that the plaintiff suffered from the following severe impairments: leukopenia,[5] hypertension, major depressive disorder, post-traumatic stress disorder, and history of substance abuse in remission. (Tr. 13.) Because the ALJ specifically found that the plaintiff had at least one severe impairment and completed the sequential evaluation process, the ALJ's alleged

---

[5]Leukopenia is the reduction in the number of leukocytes in the blood, the count being 5000 per cu. mm. or less. *Dorland's Illustrated Medical Dictionary* 922 (28th ed. 1994).

failure to find the plaintiff's additional impairments to be "severe" cannot constitute grounds for reversal. *See Maziarz*, 837 F.2d at 244. Moreover, the ALJ's decision reflects that the ALJ was aware of and considered these additional impairments in determining the plaintiff's RFC. Accordingly, the plaintiff's claim is without merit.

## 2. The ALJ erred by failing to include a function-by-function assessment in the RFC assessment as required by SSR 96-8p.

Citing SSR 96-8p, the plaintiff argues that although the "ALJ provided a lengthy RFC . . . the ALJ's decision does not include a function-by-function assessment. Specifically, the ALJ did not provide any limitations regarding pushing and pulling." (Docket Entry No. 12-1, at 6.)

SSR 96-8p provides that the "RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." 1996 WL 374184, at *3 (S.S.A. July 2, 1996). The RFC assessment must address an individual's exertional and nonexertional capacities. *Id*. at *5. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling, which must each be considered separately. *Id*. Nonexertional capacity involves "an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision)," as well as, "it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes)." *Id*. at *6. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. at *7. In assessing the RFC, the ALJ "must discuss the

individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis" and "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*.

The Sixth Circuit has stated that while "SSR 96-8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (citing *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00-1995 (3d Cir. Dec. 19, 2000)). Further, "'[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,'" as there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion." *Id*. at 547-48 (internal citation omitted). "Significantly, SSR 96-8p states that the ALJ must consider each function separately; it does not state that the ALJ must discuss each function separately in the narrative of the decision." *Hernandez v. Colvin*, No. 3:14-CV-01916, 2016 WL 699200, at *14 (M.D. Tenn. Feb. 2, 2016), *report and recommendation adopted*, No. 3-14-1916, 2016 WL 695143 (M.D. Tenn. Feb. 22, 2016); *Beason v. Comm'r of Soc. Sec.*, No. 1:13-CV-192, 2014 WL 4063380, at *13 (E.D. Tenn. Aug. 15, 2014) ("SSR 96-8p clearly states that the ALJ must consider each function separately; it does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision."). In specifying a claimant's exertional and nonexertional limitations, "'the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Delgado*, 30 F. App'x at 548 (citation omitted);

*Picklesimer v. Colvin*, No. 3:13-1457, 2015 WL 5944389, at *12 (M.D. Tenn. Oct. 13, 2015), *report and recommendation adopted*, No. 3-13-1457, 2015 WL 6690096 (M.D. Tenn. Nov. 2, 2015).

Upon review of the record, the court finds no error in the ALJ's RFC as asserted by the plaintiff. The ALJ, after considering the entire record, determined that the plaintiff retained the RFC to "perform light work," as defined in 20 CFR §§ 404.1567(b) and 416.967(b), with the following limitations:

> He can lift 20 pounds occasionally and ten pounds frequently. He can sit, stand, or walk for six hours total each. He can never climb ladders, ropes, or scaffolds. He can occasionally perform all other postural activities. He can perform no work around hazards in the workplace or unprotected heights. He is limited to unskilled work consisting of simple tasks and instructions. He can have occasional contact with the general public. He can have work-only related contact with co-workers and supervisors. He can perform no production pace or quota type work. He can handle occasional change in the workplace.

(Tr. 15.) The ALJ provided a lengthy RFC analysis. (Tr. 15-23.) The court's review shows that the ALJ appropriately considered all of the relevant evidence and sufficiently explained her decision. The ALJ discussed the plaintiff's alleged limitations, as well as her treatment history, the plaintiff's testimony, and the medical opinions in the record. (Tr. 15-23.) To the extent that the ALJ did not make a specific finding regarding every possible limitation to be gleaned from the record, the court concludes that the ALJ comprehensively assessed the plaintiff's limitations and included only the limitations that she found supported by the record. The ALJ's written decision shows that she appropriately considered the plaintiff's impairments, sever and non-severe. The court concludes that the ALJ fully considered all of the relevant evidence in accordance with SSR 96-8p and appropriately explained her decision to include only those limitations that she found supported by the record. Although the plaintiff contends that "the ALJ failed to include substantial limitations in

22

the RFC finding correlating to symptoms and limitations which were well-documented in the record," (Docket Entry No. 12-1, at 6-7), the plaintiff does not specifically identify which "substantial limitations" that "were well-documented in the record" that the ALJ omitted or reference any specific symptoms overlooked by the ALJ. Accordingly, there is no merit in this statement of error.

### 3. The ALJ erred by failing to consider properly the medical source statement ("MSS") completed by Dr. Anderson.

The plaintiff contends that the ALJ did not provide "good reasons" for discounting the limitations assigned by Dr. Anderson, the plaintiff's treating physician. (Docket Entry No. 12-1, at 9.) The plaintiff argues that the ALJ's citation to "two isolated treatment records do not paint an accurate picture of the claimant's impairments and symptoms based on the record as a whole. The ALJ ignored medical evidence of record which did support the opinion." *Id*. at 10.

Social Security regulations address three classifications of medical sources: treating sources; examining but non-treating sources; and non-examining sources. 20 C.F.R. §§ 404.1527, 416.927; 20 C.F.R. §§ 404.1502, 416.902. A treating source has a history of medical treatment and an ongoing treatment relationship with the plaintiff consistent with accepted medical practice. 20 C.F.R. §§ 404.1502, 416.902. An examining non-treating source has examined the plaintiff, but does not have an ongoing treatment relationship. *Id*. A non-examining source is a physician, psychologist, or other acceptable medical source who has not examined the plaintiff, but provides a medical or other opinion based upon medical and treatment records. *Id*.

The opinion of an examining non-treating source is given greater weight than that from a non-examining source and an opinion from a treating source is afforded greater weight than an

examining non-treating source. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (2)). "A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion. The treating physician's opinion must be supported by sufficient medical data. *Jones*, 336 F.3d at 477 (citation omitted). Thus, "[t]reating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). "Moreover, when the physician is a specialist with respect to the medical condition at issue," the specialist's "opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527([c])(5)).

"If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection." *Jones*, 336 F.3d at 477. The regulations provide that an ALJ must provide "good reasons" for discounting the weight of a treating source opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley*, 581 F.3d at 406-07 (quoting SSR 96–2p, 1996 WL 374188, at *5). The Sixth Circuit has explained that "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."

*Rogers*, 486 F.3d at 243.  If the ALJ does not accord the treating physician's opinion "controlling weight," then the ALJ must weigh the opinion based on a number of factors, including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406.  "However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding."  *Rogers*, 486 F.3d at 242 (citing SSR 96-2p, 1996 WL 374188, at *4).

On September 11, 2012, Dr. Anderson completed an MSS form, in which he opined that during an eight-hour workday the plaintiff was limited to lifting and carrying up to twenty pounds occasionally and ten pounds frequently; standing/walking for two hours; sitting for four hours; and walking around every thirty minutes for up to five minutes. (Tr. 533.) Dr. Anderson opined that the plaintiff would not need to lie down during an eight hour shift.  *Id*.  As to the medical findings that supported the plaintiff's limitations, Dr. Anderson remarked "lumbago."  *Id*.  As to postural activities, Dr. Anderson opined that the plaintiff could twist and climb stairs and ladders occasionally, but never stoop or crouch. (Tr. 534.) Dr. Anderson noted that the plaintiff's lumbago affected his reaching and pushing/pulling, but not fingering, handling and feeling.  *Id*.  Dr. Anderson did not assign any environmental restrictions.  *Id*.

The ALJ gave great weight to Dr. Anderson's opinion regarding the plaintiff's ability to lift and carry, incorporating these limitations into the plaintiff's RFC.  (Tr. 15, 23.)  The ALJ gave no weight to the ALJ's assessment of the plaintiff's ability to sit, stand and walk, explaining that "[t]hese limitations would not even equal an eight-hour workday" and that the plaintiff "would not

25

need to lie down during an eight-hour working shift." (Tr. 23.) The ALJ also gave no weight that the plaintiff "could never stoop or crouch, and was limited in reaching, pushing, and pulling." *Id*. The ALJ explained:

> [Dr. Anderson's] treatment notes, summarized above, do not support any of these extreme limitations considering that the claimant appeared to do well with his medications, and showed full range of motion in his extremities in April 2012. Further, while he may have been "sore" afterward, he felt well enough to move furniture into a new home in September 2011.

*Id*.

The ALJ noted that the plaintiff testified that Dr. Anderson was a neurologist and that the plaintiff "had his initial assessment at Affiliated Neurologists with Dr. James Anderson on February 3, 2010," reporting that "his primary problem was difficulty with his balance." (Tr. 16, 18, 45-46, 50, 335.) Dr. Anderson's treatment notes, summarized in the ALJ's decision, reflected that the plaintiff's "pain medicines" helped with his lower back pain and that "[t]here was no clear radiation into the lower extremity." (Tr. 18.) The plaintiff reported having low back pain, "for which pain medicines helped his pain." *Id*. The plaintiff's gait was normal; his Romberg test was negative; his motor examination revealed adequate fine motor facility and 5/5 strength throughout; he had no evidence of tremor, atrophy, fasciculations or tone changes; and his straight leg-raising tests were negative bilaterally. *Id*. The plaintiff "had some mild occipital neuralgia, as well as bilateral lumbosacral radiculopathy and sacroilitis." *Id*. The ALJ specifically noted that Dr. Anderson "started the claimant on Alprazolam,[6] as well as a low dose of [sedating] Gabaminergic at bedtime," and on March 24, 2010, the plaintiff was prescribed Xanax, Zoloft and Neurontin. (Tr. 18-19, 338.)

---

[6]Alprazolam is a "benzodiazepine used as an anxiolytic in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms, administered orally." *Dorland's Illustrated Medical Dictionary* 50 (28th ed. 1994).

Dr. Anderson's treatment notes further reflect that on June 9, 2011, the plaintiff's tremors were stable and that the plaintiff "reported lower back pain, shoulder, arm, and leg pain due to a moving vehicle accident." (Tr. 21.) On September 12, 2011, the plaintiff reported "that his lower back pain and neck pain had increased after he moved furniture into his new home." *Id.* On October 13, 2011, the plaintiff reported that his tremor and lower back pain were stable, and the plaintiff was prescribed Mobic[7] and Ambien. *Id.*

Analyzing Dr. Anderson's treatment notes with the other medical evidence, the ALJ noted:

Regarding the claimant's alleged physical impairments, his physical examinations were largely normal, as well as were his imaging and EKG's. The time period he exhibited his most serious symptoms was from December 2009 to perhaps May 2010. At his consultative psychological examination in June 2010, he showed shaky hands, but a normal gait. At his physical consultative examination, no mention was made of shaky hands, but he had a slight limp. Other than that, his physical examination was largely normal. It appears that his [exacerbation] of symptoms occurred when he was non-compliant with his medication. There is little indication of the claimant being on a prescribed pain medication. He was in a moving vehicle accident in June 2011, but the first indication he was on a prescribed pain medication was in October 2011. Regardless, in January 2012, he was satisfied with the level of control with his medications and in April 2012, he had full range of motion of his extremities. Of particular interest, is that his primary care provider, in his medical source statement, listed only lumbago as the reason the claimant was limited. He never mentioned the claimant's dizziness or loss of balance.

(Tr. 22.)

Based upon a review of the record, the court concludes that the ALJ properly evaluated Dr. Anderson's opinion, gave good reasons for discounting some of Dr. Anderson's opinions, and those reasons are supported by substantial evidence. Accordingly, the plaintiff's claim of error is without merit.

_____

[7]Mobic is a nonsteroidal anti-inflammatory drug ("NSAID"). Mobic is used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis in adults. https://www.drugs.com/search.php?searchterm=mobic

**4. The ALJ erred by giving great weight to the opinion of Dr. Tartt-Godbolt.**

The plaintiff argues that, although the ALJ stated that she gave great weight to Dr. Tartt-Godbolt's opinion, "the ALJ did not provide any explanation as to how she arrived at the mental limitations assigned in the RFC since those differ from the limitations assigned by Dr. Tartt-Godbolt." (Docket Entry No. 12-1, at 10-11.) On June 10, 2010, Kimberly Tartt-Godbolt, Psy.D., a licensed clinical psychologist, performed a consultative psychological examination on the plaintiff and opined that he showed evidence of mild to moderate impairment in his short term memory, no evidence of long-term and remote memory functioning, and evidence of moderate impairment in sustaining concentration, social relating and ability to adapt to change. (Tr. 19, 291.) Dr. Tartt-Godbolt also opined that the plaintiff appeared able to follow instructions, both written and spoken. *Id.* The plaintiff argues that "it is unclear how the ALJ took it upon herself to interpret the 'mild' and 'moderate' limitations into the limitations which were assigned in the RFC." (Docket Entry No. 14, at 3.)

"The Social Security Act instructs that the ALJ--not a physician--ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."). "[T]he ALJ is charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). Therefore, "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron*, 391 F. App'x at 439. The RFC does not need to be

based on a particular medical opinion. *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). The RFC does not need to correspond to a physician's opinion because the Commissioner has the final authority to make determinations or decisions on disability. *Rudd*, 531 F. App'x at 728.

Concluding that "paragraph B" and "paragraph C" criteria were not satisfied at step three of the sequential evaluation process, the ALJ determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14.) As to "paragraph B" criteria,[8] the ALJ stated:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 15.) As to the plaintiff's mental RFC, the ALJ determined: "He is limited to unskilled work consisting of simple tasks and instructions. He can have occasional contact with the general public. He can have work-only related contact with co-workers and supervisors. He can perform no production pace or quota type work. He can handle occasional change in the workplace." *Id.*

"[I]t is well established that the paragraph B criteria are not an RFC assessment." *Bing v. Comm'r of Soc. Sec.*, No. 1:15-CV-826, 2016 WL 4410796, at *4 (W.D. Mich. Aug. 18, 2016)

---

[8]"Paragraph B" "criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

(citing *Pinkard v. Comm'r of Soc. Sec.*, No. 1:13-cv-1339, 2014 WL 3389206, at *10 (N.D. Ohio July 9, 2014) (finding that because "the ALJ does not have to include paragraph B finding[s] in his RFC finding. . . . the ALJ was correct . . . in not including a 'moderate limitation in concentration, persistence, and pace' in his residual functional capacity finding at steps four and five.")). Social Security Regulation 96-8p provides:

> The psychiatric review technique described in 20 CFR 404.1520a[9] and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. *The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment* by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

1996 WL 374184, at *4 (S.S. A. July 2, 1996) (emphasis added). "Because '[t]he RFC describes the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from,' the ALJ's inquiry is necessarily broader during the RFC assessment and must account for 'all the relevant evidence in [the] case record.'" *Taylor v. Colvin*, No. 1:14CV1710, 2016 WL 760399, at *13 (N.D. Ohio Feb. 26, 2016) (alteration in original) (citations and internal quotation marks omitted).

Accordingly, the court finds that the ALJ appropriately considered Dr. Tartt-Godbolt's opinion in assessing the plaintiff's mental impairments and concludes that the ALJ's mental RFC

---

[9]Title 20 C.F.R. § 404.1520a(c)(4) provides: "When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme."

determination is supported by substantial evidence. *See Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013) ("The ALJ was under no obligation to include limitations in social functioning in Ms. Beasley's RFC based solely on his finding that she had 'moderate difficulties' in social functioning as part of the distinct step-three analysis."); *Washington v. Soc. Sec. Admin., Com'r*, 503 F. App'x 881, 883 (11th Cir. 2013) (holding that the ALJ accounted for plaintiff's moderate limitations in social functioning by limiting plaintiff to jobs that involved only occasional interaction with the general public); *Russo v. Astrue*, 421 F. App'x 184, 192 (3d Cir. 2011) (holding that having no quota to fulfill accounts for the plaintiff's moderate difficulties in concentration, persistence, and pace); *Taylor*, 2016 WL 760399, at *13 (holding that the ALJ did not err in failing to include specific limitations relating to the plaintiff's social functioning in his RFC even though the ALJ found moderate limitations in social functioning in his paragraph B criteria at Steps 2 and 3); *Mitchell v. Comm'r of Soc. Sec.*, No. 1:14CV1307, 2016 WL 304212, at *6-7 (W.D. Mich. Jan. 26, 2016) (where the ALJ found that the plaintiff had mild to moderate difficulties with regard to concentration, persistence, and pace, the court concluded, "The ALJ's findings at earlier steps in the sequential analysis do not undermine her findings that Plaintiff retained the RFC that included 'simple tasks' and no high production quotas."); *Pinkard*, 2014 WL 3389206, at *10 (the ALJ was not required to include paragraph B finding that plaintiff had moderate limitation in concentration, persistence, and pace in his residual functional capacity finding at steps four and five); *Bacon v. Colvin*, No. 12-1477-GMS, 2016 WL 556727, at *10 (D. Del. Feb. 12, 2016) ("non-production pace" adequately captures a claimant's moderate difficulties in concentration, persistence, and pace); *Padilla v. Astrue*, No. 10-cv-4968, 2011 WL 6303248, at *10 (D.N.J. Dec. 15, 2011) ("simple, unskilled work" accounts for moderate limitations in concentration, persistence or pace).

**5. The ALJ erred by failing to perform a proper credibility analysis.**

The plaintiff argues that "the ALJ merely stated that she used the criteria outlined in SSR 96-7p in reaching her decision, rather than specifically stating the weight she gave to the claimant's statements and the reasons for that weight as is required by SSR 96-7p." (Docket Entry No. 12-1, at 12.)[10] The plaintiff cites portions of SSR 96-7p, which state, in part, that the ALJ's credibility determination must do more than "simply . . . recite the factors that are described in the regulations for evaluating symptoms," and that the ALJ is not permitted to "make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id*. at 11-12 (citing SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996)).

"In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417 (6th Cir. 2011) (citing SSR 96-7p, 1996 WL 374186, at *2). "Social Security Ruling 96-7p . . . requires the ALJ explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers*, 486 F.3d at 248. "'[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" *Allen v.*

---

[10]SSR 96-7p was superseded by SSR 16-3p, which became effective on March 28, 2016. However, because the plaintiff filed his complaint in March 2014, SSR 96-7p applies to the Court's analysis of this claim.

*Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir.2009) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d at 531). An ALJ's "credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citing *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112-13 (6th Cir. 2010)).

In evaluating the plaintiff's credibility, the ALJ noted that the plaintiff consistently reported to doctors that he had a stroke, although there was no indication that he had suffered a stroke; that he told a doctor that he had a history of hepatitis C, yet there was no medical evidence to support this claim; and that he told a nurse that he had bone marrow cancer, rather than his medically diagnosed problem of leukopenia. (Tr. 21.) The ALJ also noted that the plaintiff testified that he recently lost his license because of a DUI, although he reported that he quit driving six months before his DUI arrest; that he testified that he experienced vertigo 90% of the time, but he was still driving prior to his DUI; that he testified that he could sit for only 30 minutes due to balance issues, yet he was able to ride in a car for more than an hour to the hearing with no problems; that he stated he had panic attacks "all of the time," yet was able to attend two to three hour church services; and that he reported he suffered from memory loss, yet he could recall his work history in detail. (Tr. 21-22.) The ALJ further noted that although the plaintiff alleged that he constantly ran into walls, tripped over things, and fell, he did not use any assistive devices to aid him with ambulation; that he testified that he constantly shook, yet the only reason he no longer played pool was because he no longer had a pool table; that he testified that he would burn a potato in a microwave, but according to his function report, he could prepare his own meals and microwave a sandwich; and that there was little indication of him being on a prescribed pain medication. (Tr. 22.)

Accordingly, based upon the record, the Court concludes that the ALJ's findings were supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (citation omitted).

## IV. CONCLUSION

For all of the above reasons, the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) is **DENIED**. An appropriate Order will accompany this memorandum.

_____
ALETA A. TRAUGER
United States District Judge